**LOS ANGELES TIMES COMMUNICATIONS, LLC, Plaintiff,**

v.

**DEPARTMENT OF THE ARMY, et al., Defendants.**

**No. CV 05–8293 FMC (JWJX).**

United States District Court, C.D. California.

July 24, 2006.

Alonzo B. Wickers, IV, Karen A. Henry, Kelli L. Sager, Davis Wright Tremaine, Karlene Worthington Goller, Los Angeles Times Legal Dept., Los Angeles, CA, for Plaintiff.

Tara M. La Morte, U.S. Department of Justice, Washington, DC, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COOPER, District Judge.

This matter is before the Court on Defendants' Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction and Motion for Summary Judgment (docket no. 12), filed May 22, 2006, and Plaintiff's Motion for Summary Judgment (docket no. 14), filed June 12, 2006. The Court has read and considered the moving, opposition, and reply documents submitted in connection with these motions. The matter was heard on July 24, 2006, at which time the parties were in receipt of the Court's Tentative Order. For the reasons and in the manner set forth below, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment[1] and **DENIES** Plaintiff's Motion for Summary Judgment.

### I. EVIDENTIARY OBJECTIONS

Plaintiff objects to various statements included in four of the five declarations submitted in support of Defendants' Motion.[2]

The first declaration is by Colonel Gary Pease, who currently serves as a Deputy in the Army Corps of Engineers. (Pease Decl. ¶ 1.) Colonel Pease has been in the army for twenty-two years, and he served as the Director of the Reconstruction Operations Center[3] ("ROC") in Iraq from February 2005 through July 2005. (*Id.*) Colonel Pease's duties at his current job include planning, training, and intelligence management for the U.S. Army Corps of Engineers. (*Id.*) No description is given of his past duties as Director of ROC. In his declaration, Colonel Pease describes the U.S. mission in Iraq, how ROC operates to further the U.S. mission in Iraq, and the use of Serious Incident Reports ("SIRs") by ROC. (*Id.* at ¶¶ 2–5.)

---

1. Defendants' Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction was premised on Plaintiff's pursuit of a claim that Plaintiff did not, in fact, pursue. Therefore, the Court DENIES AS MOOT Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction.

2. Defendants ask the Court to overrule Plaintiff's objections, set forth by Plaintiff as requests to strike, for failure to comply with Local Rule 7–3. The Court declines to do so.

3. ROC is a unit of the U.S. Army Corps of Engineers (USACE) Gulf Region Division (GRD) and the Project Coordinating Office (PCO). (Dillon Decl. ¶ 1.)

The second declaration is that of Lieutenant Michael E. Jonasson, who is currently serving as a full-time Active Guard Reserve judge advocate. (Jonasson Decl. ¶ 1.) Lieutenant Jonasson has been in the Air Force for sixteen years and served as the Staff Judge Advocate for the Joint Contracting Command—Iraq ("JCC–I") and General Counsel for the Iraq Project and Contracting Office ("PCO") from February 2005 to July 2005. (Id.) His duties while serving in Iraq included providing support in all legal areas associated with military command, with an emphasis on managing legal issues arising from government contract formation and administrative actions related to reconstruction efforts. (Id.) Lieutenant Jonasson's involvement in this case was limited to assisting in collecting documents in response to Plaintiff's Freedom of Information Act ("FOIA") request. (Id. at ¶ 5.) In his declaration, Lieutenant Jonasson describes how the PCO responded to Plaintiff's FOIA request, how SIRs were submitted and entered into a database, how SIRs were used by the Army and private security contractors ("PSCs"), and how SIRs could be used by the insurgents. (Id. at ¶¶ 2–6.)

The third declaration is by Colonel Bjarne Michael Iverson. Colonel Iverson has been in the Army for twenty-one years and is currently serving as a Commander in the U.S. Army in Missouri. (Iverson Decl. ¶ 1.) From July 2005 to March 2006, Colonel Iverson was Director of ROC in Iraq. (Id.) Colonel Iverson does not describe any of his duties or responsibilities as Director of ROC. In his declaration, Colonel Iverson describes the role of PSCs in Iraq, the use of SIRs by ROC, and the response to the LA Times FOIA request. (Id. at ¶¶ 2–7.)

The fourth declaration is that of Colonel Wallace L. Dillon, who has been in the Army for twenty-four years and is currently deployed in Iraq, serving as the Director of ROC. (Dillon Decl. ¶ 1.) Colonel Dillon was Deputy Director of ROC from October 2005 through April 2006, and he now serves as Director of ROC. (Id.) Colonel Dillon's duties as Deputy Director are not described in his original declaration ("Dillon Decl."). In his initial declaration, Colonel Dillon describes the U.S. Army's mission in Iraq, the purpose of ROC, the use of SIRs by PSCs and ROC, and how the release of SIRs to Plaintiff could aid the enemy. (Id. at ¶¶ 2–18.)

On June 26, 2006, Defendants filed two supplemental declarations by Colonel Dillon. (Def.'s Consol. Mot./Opp'n Exs. F–G.)

In the first supplemental declaration ("Dillon Supp.1"), Dillon describes his prior duties and training in the army in great detail. (Dillon Supp.1 ¶¶ 1–2.) Dillon also describes his specific duties as Director of ROC and how he has gained specific knowledge of the U.S. mission in Iraq (Id. at ¶¶ 2–6), and he explains that his past training and experience, together with his review of "hundreds of SIRs reports from PSCs," provide him with "significant experience regarding how insurgents operate in Iraq, how they target certain groups, individuals, or infrastructure that they ascertain are vulnerable, and how they change their tactics over time in response to the situation in the theater." (Id. at ¶ 12.) The majority of the remainder of Dillon's first supplemental declaration explains the role and significance of SIRs in the context of the ROC's operations in Iraq (Id. at ¶¶ 10–15) and illustrates how certain information contained in SIRs, e.g., information about the effectiveness of a weapons system tested by the insurgents, may be used by insurgents to "conduct battle damage assessments and vulnerability assessments" if the insurgents also have informa-

**886**

tion regarding the specific PSCs affected by the testing. (*Id.* at ¶ 11.)

In his second supplemental declaration ("Dillon Supp.2"), Dillon clarifies that the placards PSCs use to identify themselves when traveling in Iraq "are standard 8½" × 11" in size" and are "placed in the window of the vehicle, normally on the driver's side dash." (Dillon Supp.2 ¶ 2.) [4]

### 1. Objections for Lack of Personal Knowledge:

■ Plaintiff objects to portions of all four declarations on the basis of lack of personal knowledge. Fed.R.Evid. 602.[5]

■ Generally, Rule 602 requires that a witness' testimony be based on events perceived by the witness through one of the five senses. This rule operates to ensure that decisions are based on the best evidence available. Although first-hand observation is the most common form of personal knowledge, first-hand observation is not the only basis for personal knowledge. *See Stuart v. UNUM Life Ins. Co. of Am.*, 217 F.3d 1145, 1155 (9th Cir.2000) (finding a Vice President of Corporate Services had sufficient personal knowledge of company procedures to testify that his employer contributed directly to its employee insurance plan).

■ Plaintiff notes that a witness must have both the opportunity to perceive an event and must have actually perceived it. Most of Plaintiff's objections for lack of personal knowledge relate to statements made by the declarants about practices put in place before they were employed at ROC. However, Plaintiff fails to appreciate that a declarant can testify about practices or procedures in place before the witness was employed with the organization about which he is relating information. *See U.S. v. Thompson*, 559 F.2d 552, 554 (9th Cir. 1977) (finding a manager of a restaurant had ample personal knowledge to testify what normal company procedures were on a date prior to his employment).

■ Here, Plaintiff's objections to portions of the Jonasson declaration are SUSTAINED because it is unclear how Jonasson, in his role as General Counsel, acquired personal knowledge of the procedures for entering SIRs into the database, the role of PSCs, etc. However, the Court need not, and did not, rely on the Jonasson declaration for this information. The Court is persuaded that it is reasonable that each of the other three declarants (Dillon, Pease, and Iverson), Army officers in leadership positions with respect to entry and use of SIRs at the ROC and the role of PSCs in Iraq, demonstrated sufficient personal knowledge to provide competent testimony on these topics. Therefore, Plaintiff's remaining objections for lack of personal knowledge

---

4. As the ensuing discussion of Plaintiff's objections demonstrates, the Court does not separately address the admissibility of each and every statement to which Plaintiff objects. First, most of the content to which Plaintiff objects in the other three declarations is also set forth in Dillon declarations. Second, the Court does not separately rule on the numerous objections on a statement-by-statement basis; rather, the Court addresses the various bases for Plaintiff's objections and does not separately rule on the those statements on which the Court did not rely in deciding these motions.

5. The rule provides that:

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. This rule is subject to the provisions of Rule 703, relating to testimony by expert witness. Fed.R.Evid. 602.

are OVERRULED because the declarants established that their testimony is based on personal knowledge acquired through their positions and performance of their job duties.

### 2. Improper Lay Opinion:

■ Plaintiff also objects to portions of the Dillon and Jonasson declarations as improper lay opinion.[6] Plaintiff focuses on the third requirement of Rule 701–testimony cannot be based on scientific, technical, or otherwise specialized knowledge.

This third requirement was added to Rule 701 via amendment in 2000 to prevent parties from evading the reliability requirements set forth in Rule 702 by proffering expert testimony under the guise of lay opinion testimony. See Fed. R.Evid. 701 Adv. Comm. Note (2000). The Advisory Committee specifically notes that this amendment is meant to prevent non-experts from testifying using "a process of reasoning which can be mastered only by specialists in the field." Id. Instead, lay witnesses should employ a "process of reasoning familiar in everyday life." Id.

■ Generally, lay witnesses can testify to inferences or opinions that are drawn from a series of personal observations over time. See U.S. v. Holmes, 229 F.3d 782, 788–89 (9th Cir.2000) (witness's six previous thirty-minute meetings with defendant provided sufficient foundation for her lay opinion testimony identifying him on a surveillance tape). Additionally, courts may allow lay witnesses to testify to opinions based on a combination of their personal observations regarding the incident in question and their specialized knowledge obtained through their vocation. See U.S. v. Crawford, 239 F.3d 1086, 1090–91 (9th Cir.2001) (witness could testify to a university's use of a term, based on his experience with university policies); see also U.S. v. VonWillie, 59 F.3d 922, 929 (9th Cir.1995) (arresting police officer with experience in narcotics cases was properly permitted to give lay opinion testimony that drug traffickers commonly possess and use weapons to protect their narcotics).

■ The Court is persuaded that Colonel Dillon's twenty-four years' experience in the U.S. Army, coupled with his experience as Director of ROC, arm him with sufficient personal knowledge regarding the U.S. mission in Iraq, the role of PSCs in Iraq, and the possible consequences of SIRs being made available to the public. Therefore, Plaintiff's objections to portions of Colonel Dillon's declaration as improper lay opinion are OVERRULED. However, the Court SUSTAINS Plaintiff's objections to Lieutenant Jonasson's assertions regarding the possible use of SIRs because Defendants' have not demonstrated that Jonasson's position as General Counsel to the PCO qualified him to provide such opinion testimony.

### 3. Hearsay:

■ The hearsay rule operates to exclude evidence that lacks reliability due to faults in the perception, memory, or narration of the declarant.

■ The Plaintiff objects specifically to two statements in the Jonasson declara-

---

**6.** Federal Rule of Evidence 701 provides:
If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.
Fed.R.Evid. 701.

tion.[7] One statement is clearly hearsay because Jonasson states what someone else told him about the availability of SIRs and, therefore, this objection is SUSTAINED.[8] The Court did not rely on the second statement ("According to the information I was provided, this particular PSC did not provide SIRs to PCO until November 2004.") (Jonasson Decl. ¶ 6.)

#### 4. Conclusory Statements by Dillon:

Plaintiff also makes numerous additional evidentiary objections to statements in Dillon's supplemental declarations, characterizing Dillon's statements as "conclusory."[9] (See Pl.'s Objections to Supp. Decl.) For example, Plaintiff objects to Dillon's statement "I am intimately familiar with PSCs, their concerns, and the security issues they face every day" and claims it is an improper conclusion. (Id. at 6:12–16.)

Plaintiff does not identify a separate rule of evidence to support the objections to statements in the supplemental Dillon declarations as "conclusory"; rather, the objections seem to be an effort by Plaintiff to recast its objections to Dillon's statements as lacking foundation or improper opinion testimony. The Court overruled those objections supra. To the extent that Plaintiff's objections to the supplemental Dillon declarations present new objections

to new or additional statements by Dillon as improper opinion testimony, those objections are OVERRULED for the reasons set forth supra.

## II. BACKGROUND

This case arises out of the partial denial of Plaintiff's Freedom of Information Act ("FOIA") request for a database of Serious Incident Reports ("SIRs"), submitted to the Army by private security contractors in Iraq.

### A. Factual and Procedural Background

The parties do not dispute the fact that private security contractors ("PSCs") have been hired to provide security for the U.S. government, construction contractors and others in Iraq. (Defs' Statement of Genuine Issues ¶ 8.) According to the United States Government Accountability Office's July 2005 Report to Congressional Committees, entitled "Rebuilding Iraq: Actions Needed to Improve Use of Private Security Providers," the Department of Defense "estimates that there are at least 60 private security providers working in Iraq with perhaps as many as 25,000 employees." (GAO Publication GAO–05–737: Pl's Wickers Decl., Ex. 5 at 8.)[10]

---

7. In response to Plaintiff's objections, Defendants cite cases that say an affidavit relying on second-hand knowledge (e.g., statements by the supervisor of the FOIA search, not the actual people who searched for the documents) can overcome an objection for lack of personal knowledge. (See Def.'s Opp'n 11–12.) However, Plaintiff did not object for lack of personal knowledge; rather, Plaintiff objects to the statements as hearsay. Additionally, the statements to which Plaintiff objects are not about the FOIA search; they are about the availability of SIRs. The Court did not rely on the statements in ruling on the parties' cross-motions for summary judgment.

8. However, Dillon's testimony that SIRs are "readily available electronically" is admissible.

9. Plaintiff also makes an objection to one of Dillon's statements because Plaintiff argues it is inadmissible expert opinion offered by a lay witness. These objections were addressed supra.

10. The Government Accountability Office ("GAO") Report also indicates that the PSCs provide services that include providing security for: housing areas and work sites; security escorts for government employees, contractor employees, or others as they move through Iraq; convoys of vehicles and their occupants

Many PSCs in Iraq voluntarily file SIRs with the Reconstruction Operations Center ("ROC") to report their involvement in or observation of life-threatening events during their operations. The ROC is a directorate of Defendant Iraq Projects and Contracting Office ("PCO"), which was created in October 2004, to enhance coordination between PSCs and Coalition military units in Iraq.[11]

Virtually all of the incidents reported in SIRs involve hostile interactions with insurgents and other enemy forces. Some involve "blue-on-blue" or "friendly fire" type incidents involving PSCs and Coalition military personnel.

According to the attachment to the SIR form, "serious incidents" include: "Change of Status/Attack/Sabotage/Looting on power grid (Electrical Power/Dams/Substations/Lines)"; "Change of Status/Attack/Sabotage/Looting on pipeline(s) (Oil/LPG) or oil companies"; "Assassination/at-tack/kidnap or attempt on leadership"; "Attack on commercial convoy"; and "Infraction of ROE [Rule of Engagement] or any event that may elicit an adverse political, media or international reaction (cross border, foreign figure/leader arrest; attack or arrest against a coalition or allied element)." (Wickers Decl. Ex. 7 at 4.)

The parties do not dispute the timing and content of Plaintiff's FOIA request or Defendants' responses to that request.

On April 5, 2005, Plaintiff Los Angeles Times Communications, LLC ("Plaintiff" or "The Times") submitted its FOIA request to Defendant Iraq Project and Contracting Office ("PCO"), a component of Defendant Department of the Army ("Army").[12] Specifically, Plaintiff requested disclosure of:

> The database, and all affiliated relational tables, of serious incident reports (SIRs) sent by contractors to the Project and

as they make their way into Iraq or within Iraq. (Pl's Wickers Decl, Ex. 8 at 9.)

**11.** In its "Statement of Genuine Issues and Response to Defendants' Separate Statement of Uncontroverted Facts and Conclusions of Law," Plaintiff affirmatively states that it does not dispute the following facts:

> [1.] Once received by the ROC, SIRs are typed into a SIRs database by the ROC watch officer. All SIRs are entered into the database. The PCO electronically organizes the SIRs into monthly Word document files.
> [2.] Some private security contractors do not include their company names in their SIRs submissions.
> [3.] Beginning in October 2004, the ROC instituted a policy whereby the names of private security contractors are not entered into the SIRs database. The policy was implemented to encourage the submission of SIRs by private security contractors.
> [4.] The SIRs are also uploaded directly from the database onto a website. Access to the website involves an application process and is limited to Army officials and private security contractors with a need to know the information for the performance of their security-related duties. A username and password is required to access the website.
> (Pl's Stmt. of Genuine Issues ¶¶ 13–16.)

Further, the Court notes that the GAO Report Plaintiff submits in support of its Motion describes the "battle space" in Iraq as "[a] complex battle space [which] is one where military forces, civilian U.S. government agencies, international organizations, contractors, nongovernmental organizations, and the local population share the same geographical area." (Wickers Decl, Ex. 5 at 7.) The Report characterizes the goal of the ROC as "provid[ing] situational awareness, develop[ing] a common operating picture for contractors and the military, and facilitat[ing] communication between the military and contractors." (*Id.* at 23.)

**12.** According to Defendants, Plaintiff's request was forwarded by the Assistant Secretary of the Army Acquisition, Logistics, and Technology ("ASAALT") FOIA and Privacy Office to the Office of the chief Attorney and Legal Services Directorate, Department of the Army, on April 6, 2005.

Contracting Office; a record layout for all such tables therein; and a data dictionary to all coding used within the databases.

(Compl.Ex. A.)

Plaintiff further requested that the information be provided in electronic format, accessible by off-the-shelf commercial software. (*Id.*)

On June 5, 2005, Defendants [13] released 83 pages of responsive documents, which included 79 pages of partially redacted SIRs and four pages of an Acronym List. According to the letter from the Chief of the FOIA Program for the Office of the Administrative Assistant to the Secretary, U.S. Army Resources and Programs Agency ("ARPA") in Washington, DC, the redacted information [14] was withheld under FOIA exemption (b)(2) which exempts from disclosure internal agency documents where disclosure risks circumvention of agency regulation or statutes, and exemption (b)(6) which applies to information that would violate personal privacy interests.[15] (Miller Decl., Ex. 2.)

On June 23, 2005, Plaintiff appealed the partial denial of the FOIA request, seeking the specific names of the private contracting companies working in Iraq. Plaintiff also asked Defendants to provide a reason for not providing the database in a form accessible by off-the-self commercial software.

On July 25, 2005, Defendants denied Plaintiff's appeal and request to release the redacted names of the private contractors. The denial, issued by Defendant ARPA, notes that Plaintiff's appeal "did not object to the redactions done in black in the documents released to [Plaintiff]. Instead, you are appealing the company names which you believe were redacted, designated by 'XXXX' or 'deleted' in the released documents." (Miller Decl. Ex. 4.) The denial explains that the information at issue was exempt from disclosure under the following FOIA exemptions: exemption (b)(2) for internal documents, the disclosure of which risks circumvention of agency regulations or statutes; exemption (b)(5) for pre-decisional and deliberative processes; and exemption (b)(7)(F) for law enforcement records or information, the disclosure of which "could reasonably be expected to endanger the life or physical safety of any individual." (*Id.*) Additionally, the denial states that the documents were made available to ARPA in hard copy format. (*Id.*)

On November 23, 2005, Plaintiff filed suit for violation of FOIA, alleging that Defendants have no legal basis for withholding the names of private contracting companies contained in SIRs.

---

13. The following defendants are named in Plaintiff's Complaint: Department of the Army ("Army"); U.S. Army Resources and Programs Agency ("ARPA"); Office of the Assistant Secretary of the Army, Acquisition Logistics, and Technology ("ASAALT"); and Iraq Projects and Contracting Office ("PCO"). For purposes of this Order, the Court will refer to the group, collectively, as "Defendants."

14. The redactions withheld information that included unit identifiers, location, and the names of individual military personnel.

15. Plaintiff affirmatively states that it does not dispute Defendants' assertion that they:

initially construed Plaintiff's FOIA request as requesting SIRs submitted by a particular contractor. Defendants' first search of the database and production of SIRs on June 5, 2005[,] thus contained only those SIRs authored by the particular contractor. Defendants furnished Plaintiff with a 'no records certification' for the period between July 2004 and November 2004, as that particular contractor did [not] begin filing SIRs until November 2004.

(Pl's Stmt. of Genuine Issues ¶ 20.)

On March 2, 2006, Defendants released to Plaintiff 793 additional pages of partially redacted SIRs.[16] The redactions withheld, *inter alia*, the names of PSC companies involved in the reported incidents.

## B. The Instant Motions

The facts are not in serious dispute. Rather, with their cross motions for summary judgment, the parties ask the Court to determine whether Defendants violated FOIA by withholding the names of the private security contract companies contained in the SIRs reports and database.

Defendants claim that they may withhold the names of the PSC companies in the SIRs pursuant to FOIA exemptions (b)(7)(F) and (b)(2). In support of their Motion, Defendants furnished declarations from Army officers: (a) outlining the roles of and relationships between ROC and PSCs in Iraq, (b) describing the processes involved in updating the SIRs database and making the information in that database available, and (c) explaining that the disclosure of the PSC company names, coupled with presently available information about prior insurgent attacks, could enable insurgents to target particular PSC companies. Defendants also filed the declaration of Paul DeAgostino, Associate Counsel, in the Office of the Chief Attorney and Legal Services Directorate of ARPA. The DeAgostino Declaration, and the accompanying *Vaughn* Index, recount Defendants' position regarding the applica-

bility of various FOIA exemptions to some of the information contained in the SIRs database.

The evidence Plaintiff submitted in support of its Motion for Summary Judgment includes: (a) two declarations from individuals with extensive research backgrounds and interest in the role of PSCs in Iraq (Tiefer and Rosenthal Decls.), explaining the public interest in the PSC company names;[17] (b) a declaration from the Times reporter who made and pursued the FOIA request at issue in this case (Miller Decl.); (c) a GAO report to Congressional Committees entitled "Rebuilding Iraq: Actions Needed to Improve Use of Private Security Providers"; (d) the May 11, 2004 National Security Presidential Directive regarding United States government operations in Iraq;[18] and (e) representative samples of the first 83 pages of partially-redacted SIRs provided in response to Plaintiff's FOIA request.

With its Motion, Plaintiff contends that exemption 7(F) does not apply because: (1) the ROC does not have a law enforcement mandate, (2) the ROC's purpose in compiling the SIRs does not relate to a law enforcement mandate, and (3) Defendants have not shown that disclosure of the names of the PSC companies would endanger the life or physical safety of any individual.

Additionally, Plaintiff argues that the PSC company names are not exempt under the provisions of subsection (b)(2) be-

---

16. Defendants maintain that those documents represent all the SIRs contained in the database in question. Plaintiff maintains that this fact has not been verified.

17. For example, the Tiefer Declaration explains that the PSC company names are "of great interest to reporters, authors, and academics studying the procurement procedures for the war in Iraq." (Tiefer Decl. ¶ 10.) The Rosenthal Declaration explains that "[t]here is an intense public interest in learning more

information about the unprecedented assistance that these security contractors provide to the U.S. military in Iraq, where contractors play a much more significant role than they have in any previous American military conflict." (Rosenthal Decl. ¶ 8.)

18. Defendants also included a copy of this Presidential Directive as an exhibit to the Dillon declaration.

cause: (a) the SIRs are not predominantly internal and do not relate to internal personnel practices or rules, and (b) disclosure would not risk circumvention of the ROC's regulations.[19]

## III. APPLICABLE LEGAL STANDARDS

### A. Freedom of Information Act

The Freedom of Information Act, ("FOIA"), derives from Congress' 1966 revision of the public disclosure section of the Administrative Procedure Act. *Dep't of Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). Congress called for this revision because no statute effectively provided for disclosure of information to the public by the "hundreds of [governmental] departments, branches and agencies which are not directly responsible to the people." *SDC Dev. Corp. v. Mathews,* 542 F.2d 1116, 1119 (9th Cir.1976). The original public disclosure section of the Act had "fall[en] far short of its disclosure goals and [had come] to be looked upon more as a withholding statute than a disclosure statute." *Rose,* 425 U.S. at 361, 96 S.Ct. 1592. Congress found that the public could not be an "informed electorate" absent the ability to monitor and react to these government agencies' actions. *See SDC Dev. Corp.,* 542 F.2d at 1119. Stated otherwise, the development of FOIA was motivated by Congress' belief that "the public as a whole has a right to know what its Government is doing." *See Id.,* (quoting S.Rep. No. 813, 89th Cong., 1st Sess. 5 (1965)).

■■■ FOIA provides individuals with a "judicially-enforceable right of access to government agency documents." *Lion*

*Raisins, Inc. v. U.S. Dep't of Agric.,* 354 F.3d 1072, 1079 (9th Cir.2004)(citing 5 U.S.C. § 552). The primary purpose of enforcing this right of access is to "ensure an informed citizenry, [which is] vital to the functioning of a democratic society, [and] needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 152, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989) (quoting *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978)).

■■■ The Supreme Court has interpreted FOIA broadly, requiring "full agency disclosure" except where specifically exempted by the Act. *Lion Raisins,* 354 F.3d at 1079. There are nine statutory exemptions, each of which protects against the disclosure of a specific set of sensitive government information. 5 U.S.C. § 552(b)(1)-(9) (2002). These exemptions "must be narrowly construed" so as not to undermine the Act's basic purpose of public access. *See John Doe Agency,* 493 U.S. at 152, 110 S.Ct. 471.

■■■ Even where material falls within one of FOIA's nine enumerated exemptions, Section 552(b) further requires disclosure of "any reasonably segregable portion of a record ... after deletion of the portions which are exempt." 5 U.S.C. § 552(b). The Ninth Circuit has established that it is reversible error for a district court "to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof." *Church of Scientology of Cal. v. U.S. Dept. of Army,* 611 F.2d 738, 744 (9th Cir.1979); *accord Wiener v.*

---

19. Plaintiff also argues that the SIRs are not exempt under (b)(2)'s "low 2" exemption for information related to trivial administrative matters because the SIRs are of public interest. However, Defendant has not asserted and does not argue that the "low 2" exemption applies.

*F.B.I.*, 943 F.2d 972, 988 (9th Cir.1991). Non-exempt portions of a document must be disclosed unless the Court finds that they are " 'inextricably intertwined with exempt portions' " to such a degree that separating the two would "impose significant costs on the agency and produce an edited document with little informational value." *Willamette Indus., Inc. v. United States*, 689 F.2d 865, 867–68 (9th Cir. 1982) (quoting *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260–61 (D.C.Cir.1977)).

## B. Summary Judgment

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. Rule Civ. Pro. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment. *Harper v. Wallingford*, 877 F.2d 728 (9th Cir.1989).

The Court construes all evidence and reasonable inferences drawn therefrom in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Brookside Assocs. v. Rifkin*, 49 F.3d 490, 492–93 (9th Cir.1995).

## C. Summary Judgment in FOIA Cases

█ "Summary judgment is the procedural vehicle by which nearly all FOIA cases are resolved." *National Resources Defense Council v. U.S. Dep't of Defense*, 388 F.Supp.2d 1086, 1094 (C.D.Cal.2005) (quoting *Mace v. EEOC*, 37 F.Supp.2d 1144, 1146 (E.D.Mo.1999)) (internal quotations omitted). However, the typical standard for summary judgment is not sufficient in a FOIA proceeding. *Id.* Because the facts are rarely in dispute in a FOIA case, the court need not ask whether there is a genuine issue of material fact. *Minier v. Central Intelligence Agency*, 88 F.3d 796, 800 (9th Cir.1996). Rather, the standard for summary judgment in a FOIA case generally requires a two-stage inquiry.

█ First, the Court must determine whether the agency has met its burden of proving that it fully discharged its obligations under FOIA. *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir.1985) (citing *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350–1351 (D.C.Cir.1983)). The agency can establish this by demonstrating that it has conducted a search reasonably calculated to uncover all relevant documents. *Id.* The question is not whether any other relevant documents could possibly exist, but rather whether the agency's search for the documents was adequate, as measured by a reasonableness standard. *Weisberg*, 705 F.2d at 1351.

Second, if the Court determines that this initial burden has been met, the next step of the inquiry examines whether the agency has proven that the information that it did not disclose falls within one of the nine FOIA exemptions. 5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of State v. Ray,* 502 U.S. 164, 173, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991) ("The burden remains with the agency when it seeks to justify the redaction of identifying information in a particular document as well as when it seeks to withhold an entire document."); *Dobronski v. FCC,* 17 F.3d 275, 277 (9th Cir.1994).

In sum, to prevail on summary judgment in a FOIA proceeding, where the underlying facts and possible inferences are construed in favor of the FOIA requester, an agency must prove that it has met both of these burdens. *National Resources Defense Council,* 388 F.Supp.2d at 1095 (citing *Weisberg,* 705 F.2d at 1350).

## IV. DISCUSSION

Plaintiff does not challenge the adequacy of Defendants' efforts to perform a search reasonably calculated to uncover all relevant documents. Further, Plaintiff does not challenge Defendants' discharge of their obligation to determine whether the SIRs provided to Plaintiff contain segregable material. (Pl's Response to Defs' Concl. of Law ¶¶ 1–2.)

At Oral Argument, Plaintiff's Counsel argued that at least some of the SIRs are "segregable" such that Defendants cannot withhold the names of PSC companies involved in at least some of the incidents reported in some of the SIRs, *e.g.,* those PSC companies with personnel: injured or killed in friendly-fire incidents with U.S. military, alleged to have attacked Iraqi civilians, or otherwise engaged in incidents that would cause "embarrassment" to U.S. forces or the PSCs. However, with this litigation, Plaintiff has sought the release of *all* PSC company names in connection with *all* SIRs in the SIRs database. In support of its own motion for summary judgment and in opposition to Defendants' motion for summary judgment, Plaintiff has argued that the two FOIA exemptions discussed in detail *infra* do not apply to the contents of the SIRs database, as a whole. Plaintiff's FOIA request to Defendants and its conduct of this litigation has not put the question of the segregability of some of the PSC names in some of the SIRs before this Court.

Therefore, the Court's inquiry begins with the second step of the summary judgment standard for FOIA cases: whether Defendants have met their additional burden of proving that redacted PSC company names fall within one of the FOIA exemptions they have asserted. *See Schiffer v. F.B.I,* 78 F.3d 1405, 1409 (9th Cir.1996) ("[T]he question of whether a document fits within one of FOIA's prescribed exemptions is one of law." (internal quotation and citations omitted)).[20]

**20.** The SIRs provided to Plaintiff were partially redacted. The redactions obscured information that included unit identifiers, locations, the names of individual military personnel, and the PSC company names. It is not clear from the record whether those redactions were made before or after the PSCs provided the SIRs to the ROC for entry into the SIRs database. Colonel Dillon's representation that the PSC company names omitted from the SIRs entered into the SIRs database after October 2004 may be maintained in a "hard copy file of SIRs, some of which include the name of the PSC submitting the report.... this file is maintained separately from the database" (Dillon Decl. ¶ 15) suggests that Plaintiff's request for disclosure of the PSC company names is not necessarily consistent with its initial request for the SIRs database itself. However, the Court considers Plaintiff's request for disclosure of the PSC company names to the ex-

At Summary Judgment in a FOIA case, the agency may satisfy its burden of proving that information withheld comes within one of the exemptions by submitting detailed affidavits showing that the information "logically falls within the claimed exemptions." *Minier v. C.I.A.*, 88 F.3d 796, 800 (9th Cir.1996) (quoting *Hunt v. C.I.A.*, 981 F.2d 1116, 1119 (9th Cir.1992)). The Agency affidavits must be non-conclusory in nature, contain reasonably detailed descriptions of the documents, and allege facts sufficient to establish an exemption. *See Kamman v. IRS*, 56 F.3d 46, 48 (9th Cir.1995); *see also Miller v. Casey*, 730 F.2d 773, 776 (D.C.Cir.1984) ("Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.") (internal quotations and citations omitted). If submitted in good faith, such affidavits are to be accorded substantial weight in evaluating a claim for exemption. *Minier*, 88 F.3d at 800.

## A. Law Enforcement Purposes Exemption

The Law Enforcement Purposes Exemption [21] excludes from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to endanger the life or physical safety of any individu-

al." 5 U.S.C. § 552(b)(7)(F); *see also John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 157, 110 S.Ct. 471, 478, 107 L.Ed.2d 462 (1989) ("In applying Exemption 7, the court carefully has examined the effect that disclosure would have on the interest the exemption seeks to protect."). The agency seeking the exemption bears the burden of proving that its records qualify for exemption from disclosure. *Lion Raisins v. U.S. Dep't of Agric.*, 354 F.3d 1072, 1079 (9th Cir.2004).

### 1. Records or Information Compiled for Law Enforcement Purpose:

The threshold consideration whenever an agency asserts the Law Enforcement Purposes Exemption is "whether the agency may exercise a law enforcement function," a determination which turns on an examination of the agency itself. *Church of Scientology Int'l v. U.S. Internal Revenue Service*, 995 F.2d 916, 919 (9th Cir.1993) [hereinafter *Scientology v. IRS*] (quoting *Church of Scientology v. U.S. Dep't of the Army*, 611 F.2d 738, 748 (9th Cir.1979)).

An agency with a "clear law enforcement mandate" need only establish a "rational nexus" between enforcement of a federal law and the document for which an exemption is claimed. *Church of Scientology v. Army*, 611 F.2d at 748 [hereinafter *Church v. Army*]. For example, in *Scientology v. IRS*, the Ninth Circuit explained that it had previously found that the IRS had a clear law enforcement mandate, and the court proceeded to examine whether it was performing a law enforcement function in compiling the documents in ques-

---

tent that the redactions were made after the SIRs were provided to the ROC and the redacted PSC company names were otherwise available to or compiled by the ROC in connection with the creation of the SIRs database.

**21.** For purposes of this Order, the Court will refer to the exemption set forth at subsection (7)(F) as the "Law Enforcement Purposes Exemption."

tion. *Scientology v. IRS*, 995 F.2d at 919. The court found that the agency had "the salient characteristics of law enforcement" because it performed "both voluntary compliance and formal determination functions." *Id.*

Similarly, in *Center for National Security Studies v. U.S. Department of Justice*, 331 F.3d 918, 926 (D.C.Cir.2003), the agency in question, the Department of Justice, had a clear law enforcement mandate. Therefore, the agency's declarations needed only to establish: (1) a "rational nexus" between the investigation that led to the detention of individuals in the wake of the terrorist attacks of September 11, 2001, and one of the agency's law enforcement duties, and (2) "a connection between an individual or incident and a possible security risk or violation of federal law." *Id.* at 926.

■■ However, a "mixed function" agency, one that performs both administrative and law enforcement functions, "must demonstrate that it had a purpose falling within its sphere of enforcement authority in compiling the particular document." *Id.* (explaining that, in making this determination, "courts must look to the purpose behind the compilation of the document") (internal quotation and citation omitted). In other words, the agency must show that the files "were compiled for adjudicative or enforcement purposes." *Id.* (quoting *Rural Hous. Alliance v. U.S. Dep't of Agric.*, 498 F.2d 73, 80 (D.C.Cir. 1974)). For example, in *Church v. Army*, the Ninth Circuit remanded the case to the district court for further inquiry into the Naval Investigative Service's law enforcement authority because there was "no showing that the investigation involved the enforcement of any statute or regulation within the authority of the NIS." *Id.* at 748–49. The court explained that "[g]enerally, files such as 'internal audits' compiled simply to determine whether an agency's internal operations comport with statute or regulation do not qualify." *Id.* at 748.

■■ Here, Defendants do not claim a "clear law enforcement mandate." Rather, the question before the Court is whether the ROC, a division of Defendant PCO, functioned as a "mixed purpose" agency and was functioning within a cognizable "sphere of enforcement authority" in compiling the SIRs.

The SIRs are compiled by the ROC in Iraq. The ROC is a component of the PCO, which was established by a January 20, 2003 National Security Presidential Directive, which explained that the PCO was created within the Department of Defense "to provide acquisition and project management support with respect to activities in Iraq" and explained that "PCO's services may include engineering, auditing, and other contract-related services." (Dillon Decl., Ex. E–1; Wickers Decl, Ex. 6.)

The GAO's July 2005 Report to Congressional Committees, "Rebuilding Iraq," explains how the need for PSCs developed in Iraq and explains the role of the ROC (*e.g.*, insurgents' targeting of nonmilitary targets) and addresses many of the "operational, legal, and contracting questions" raised by the presence and activities of PSCs. (Wickers Decl, Ex. 5 at 1.) The GAO Report also explains the important role PSCs play in enabling the U.S.-led reconstruction efforts to proceed. (*Id.* at 5.) As the Report also explains:

> The stated mission of the U.S. military forces in Iraq is to establish and maintain a secure environment, allow the continuance of relief and reconstruction efforts, and improve the training and capabilities of the Iraq Security Forces. As part of this mission, U.S. forces in Iraq provide security for DOD civilians

who deploy with the force, non-DOD U.S. government employees who are embedded with the combat forces, and contractors who deploy with the combat force.

(*Id.* at 10.) The GAO report also describes one of the military's functions in Iraq as providing assistance to PSCs when they come under attack:

According to U.S. officials and contractor personnel we interviewed, U.S. military forces in Iraq will provide, when assets are available, emergency quick reaction forces to assist contractors who are engaged in hostile fire situations. The military is also providing other support services to government-funded contractors, to include private security providers. For example, U.S. military forces will assist with the recovery and return of contractor personnel who have been kidnapped or held hostage.

(Wickers Decl, Ex. 5 at 19.)

Additionally, Defendants have submitted competent, uncontroverted evidence in the form of declarations that, in compiling the SIRs, the ROC was functioning pursuant to a law enforcement mandate. Specifically, the declarations establish that the SIRs were compiled in order to aid the Army in fulfilling its mission in Iraq, which includes reconstruction and maintenance of law and order.

Colonel Dillon's declaration reiterates the information about the ROC's operations in Iraq, explaining that "[t]he ROC is responsible for coordinating security escort support to PCO and GRD [Gulf Region Division of the Army Corps of Engineers] personnel at job sites throughout Iraq. In addition, the ROC provides operations and threat information to registered contractors, tracks contractor convoys, and in an emergency, coordinates military quick reaction forces and medical evacuation through regional ROCs (RROCs)." (Dillon Supp.2 ¶ 7.)

Colonel Pease, the former director of ROC, explains that the ROC's mission is to provide an interface between PSCs and the Coalition military units operating in Iraq. (Pease Decl. ¶ 3.) It is uncontroverted that PSCs voluntarily submit SIRs when they "witness or [are] involved with an attack or other serious incident." [22] (*Id.* at ¶ 4.)

Colonel Iverson, assigned to a PCO directorate in Iraq during the relevant period, explains that the "purpose of maintaining the SIRs was to analyze the information the SIRs contained in order to assist the contractors and the military units operating in Iraq in identifying insurgent tactics and areas of heightened insurgent activity." (Iverson Decl. ¶ 3.) He also notes that the SIRs were used for periodic briefings to the PCO Di-

**22.** Whether the PSC company name is included on an SIR or not, it is clear that, as of October 2004, the ROC has not entered the PSC company name when it enters the SIR data into the SIRs database. (*Id.* at ¶ 5; Dillon Decl. ¶ 15.)

Colonel Pease explains the PSCs' reasons for not wanting their names made public: "If the names of the PSCs involved in the SIRs[-]related incidents are released publicly, the PSCs will cease reporting SIRs incidents, because of the embarrassment and commercial disadvantage that follows from the public (including competing contractors) being

made aware of attacks on these security companies." (*Id.* (emphasis added).) Colonel Pease concludes that if the PSCs stop providing SIRs, the military:

will no longer have a clear intelligence picture regarding the operations of insurgents in Iraq. This affects not only the PSCs, but the military personnel operating in Iraq as well. The military see the PSCs as another 'sensor,' observing enemy activity and contributing to their overall understanding of the enemy.

(*Id.*)

rector and his staff, "primarily for the director's situational awareness." (Id.) Iverson also verifies that PSC names were not entered into the SIRs database in order to encourage reporting by PSCs. (Id. at ¶ 5.)

Colonel Dillon explains that the SIRs "enable the Army to fulfill its mission which includes suppressing unlawful activities by alerting both military and contractors of various insurgent tactics and 'hot spots.'" (Dillon Decl. ¶ 5.) Dillon also explains that "[s]ince the PSCs are on the roads daily, and are reporting insurgent activities on the roads to the ROC through the SIRs, the ROC has a solid and valuable understanding of what is taking place on the roads of Iraq that is extremely useful to the military units." (Dillon Supp.2 ¶ 10.)

The Court finds the Court of Appeals for the District of Columbia's decision in Center for National Security Studies v. U.S. Department of Justice is instructive here. Examining the Department of Justice's compilation of lists of the names of individuals detained during the post-September 11 investigation, the court concluded:

> The names have been compiled for the 'law enforcement purpose' of successfully prosecuting the terrorism investigation. As compiled, they constitute a comprehensive diagram of the law enforcement investigation after September 11.

Id. at 926.

The Court finds that Defendants have established that the ROC's purpose in compiling the SIRs and maintaining the SIRs database falls within a cognizable law enforcement mandate in Iraq: its tracking of insurgent attacks on and other unlawful activities against Coalition forces and PSC employees to improve intelligence information that will enhance security for reconstruction efforts. It is clear that the ROC's collection of SIRs and maintenance of the SIRs database is not akin to the type of "internal audit" that would fall short of the standard for compilation for a law enforcement purpose. The SIRs collected and maintained by the ROC were compiled, at least in large part, for cognizable law enforcement purposes.

## 2. Endangerment of Life or Physical Safety of Any Individual:

 To qualify for the Law Enforcement Purposes Exemption, an agency must also establish non-conclusory reasons why disclosure of each category of withheld documents would reasonably be expected to endanger the life or physical safety of any individual. See Feshbach v. Secs. & Exch. Comm'n, 5 F.Supp.2d 774, 787 (N.D.Cal.1997); PHE, Inc. v. Dep't of Justice, 983 F.2d 248, 252 (D.C.Cir.1993).

The test is not whether the PSC company names alone are sufficient to directly result in a threat to the safety of military and PSC personnel in Iraq. See Coastal Delivery Corp. v. United States Customs Service, 272 F.Supp.2d 958, 964–65 (C.D.Cal.2003). Rather, Defendants maintain that the threat arises because this fact-the names of the PSC company or companies affected by each attack reported in a SIR-taken together with other information insurgents have about attacks on government and private reconstruction efforts in Iraq, may provide them with enough information to organize attacks on vulnerable PSC companies or the projects they protect. Id. (quoting Davin v. U.S. Dept. of Justice, 60 F.3d 1043, 1064–65 (3d Cir.1995): "[t]he information is not of obvious importance in itself; but, if it were released to the plaintiff and combines [sic] with other known data, in a 'mosaic' analysis, it could lead to identification of sub-

stantive information in the file which has been withheld.")

The Court defers to Colonel Dillon's predictive judgments about the effect of the disclosure of the PSC company names. He explains how information about separate successful insurgent attacks, together with the names of the PSC companies affected by those attacks, could enable the insurgents to "conduct battle damage assessments and vulnerability assessments." (Dillon Supp.2 ¶ 11.) He explains that "each piece of information received must be scrutinized closely to determine if it contains information that could be put to use by the insurgency.... each SIR must be evaluated individually to determine its potential impact."

As the Court of Appeals for the District of Columbia so eloquently summarized in *Gardels:*

> The test is not whether the court personally agrees in full with the [agency's] evaluation of the danger—rather, the issue is whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility in this field of foreign intelligence in which the [Agency] is expert and given by Congress a special role.

*Gardels v. C.I.A.,* 689 F.2d at 1105 (citing See S.Rep.No.93–1200, 93d Cong., 2d Sess. 12, reprinted in (1974) U.S.Code Cong. & Ad.News 6267, 6290); *see also C.I.A. v. Sims,* 471 U.S. 159, 180, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985) (accepting the CIA Director's judgment that disclosure of names and institutional affiliations of certain researchers in a government-sponsored program and explaining that "it is the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of subtle and complex factors in determining whether disclosure of the information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process.").

Further, the Court's decision is informed by the following passage from *Center for National Security Studies,* wherein the court discusses the government's burden of demonstrating a reasonable likelihood of establishing that the redacted detainee names were properly withheld under FOIA exemption 7(A), 5 U.S.C. § 552(b)(7)(A), for law enforcement records or information that "could reasonably be expected to interfere with enforcement proceedings":

> It is equally well-established that the judiciary owes some measure of deference to the executive in cases implicating national security, a uniquely executive purview. *See, e.g., Zadvydas v. Davis,* 533 U.S. 678, 696, 121 S.Ct. 2491, 2502, 150 L.Ed.2d 653 (2001) (noting that "terrorism or other special circumstances" might warrant "heightened deference to the judgments of the political branches"); *Dep't of the Navy v. Egan,* 484 U.S. 518, 530, 108 S.Ct. 818, 825–26, 98 L.Ed.2d 918 (1988) ("courts traditionally have been reluctant to intrude upon the authority of the executive in military and national security affairs").

*Center for Nat'l Sec. Studies,* 331 F.3d at 926–27.

Here, Defendants have provided declarations sufficient to establish that disclosure of the PSC company names could reasonably be expected to endanger the life or physical safety of many individuals. Defendants' position, detailed in the declarations of Army officers in leadership positions at the ROC, is not impermissibly conclusory; it is reasonably detailed, demonstrates that the PSC company names logically fall within the claimed exemption, and is not controverted by contrary evidence in the record or any evidence of

agency bad faith. The opinions and conclusions in the Dillon Declaration, in particular, appear logical and plausible in context of the complex battlefield in Iraq today. *See Id.* at 929–32 (accepting the government's "predictive judgments of the harms that would result from disclosure").

For example, Colonel Dillon explains about the disclosure of the PSC company names:

> As some PSCs only operate in limited regions, this identification itself is considered sensitive information because it might tie a specific PSC to certain project sites due to repeated client visits for quality assurance or other construction controls. Revealing the name of the PSC in a[n] SIR would, therefore, result in revealing to insurgents a location where a particular PSC operates. Providing this amount of detailed information would allow the enemy to complete a Battle Damage Assessment (BDA) as to the success of their violent attacks on coalition forces and private security contracts.... [R]eleasing this information to the public provides an advantage to the insurgents and has the effect of hindering the mission.

(Dillon Decl. ¶ 15.)

Accordingly, the Court accepts the Defendants' assessment that disclosure of the PSC company names might very well be expected to endanger the life or safety of military personnel, PSC employees, and civilians in Iraq.[23] Defendants have met

their burden of showing that they acted permissibly in withholding the PSC company names pursuant to the Law Enforcement Exemption. Defendants' showing is not controverted by contrary evidence in the record or by evidence of agency bad faith.

Therefore, Defendants' Motion for Summary Judgment is GRANTED on the issue of the withholding of the PSC company names pursuant to the Law Enforcement Purposes Exemption at 5 U.S.C. § 552(b)(7)(F).

### B. "High 2" Exemption for Internal Rules and Practices Exemption

▮▮▮▮▮ The Internal Rules and Practices Exemption[24] shields from disclosure "matters that are ... related solely to the internal rules and practices of an agency." 5 U.S.C. § 552(b)(2). The "high 2" exemption applies to "[m]aterial which is used for predominantly internal purposes ... if the agency demonstrates that ... disclosure may risk circumvention of the agency regulation." *Feshbach v. Secs. & Exch. Comm'n,* 5 F.Supp.2d 774, 787 (N.D.Cal. 1997) (citing *Schiller v. N.L.R.B.,* 964 F.2d 1205, 1207 (D.C.Cir.1992)).

▮▮▮▮ The Court of Appeals for the District of Columbia has formulated a two-part test for determining whether the Internal Rules and Practices Exemption applies. Information is exempt from disclosure if: (1) the document is predominantly

---

**23.** The Court does not credit Miller's recounting of his observations while reporting on PSCs in Iraq as controverting Dillon's conclusions that disclosure of the PSC names would not be expected to endanger the life or physical safety of any individual, *i.e.* his assessment that the patches and flag placards used by PSCs for identification "do not make the contractors identifiable to Iraqis or insurgents ... [and] are useful only at close range" such that "even if the insurgents had access to a list of the names of the contractor-companies,

the list would not enable the insurgents to target any particular contractor because they still would not be able to determine which contractor-companies were driving which vehicles." (Miller Decl. ¶ 7.)

**24.** For purposes of this Order, the Court will refer to the exemption set forth at subsection (2) as the "Internal Rules and Practices Exemption."

internal, and (2) its disclosure would significantly risk circumvention of agency regulations or statutes. *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 670 F.2d 1051, 1073–74 (D.C.Cir.1981). The Ninth Circuit rule for the Internal Rules and Practices Exemption specifically excludes from disclosure "law enforcement materials, the disclosure of which may risk circumvention of agency regulation." *Hardy v. Bureau of Alcohol, Tobacco, & Firearms,* 631 F.2d 653, 656 (9th Cir.1980).

■ Law enforcement materials "involve methods of enforcing the laws, however interpreted." *Id.* at 657 (explaining the distinction between materials that explain law enforcement *methods* and "administrative materials" that *define* violations of the laws and, as such, do not qualify for exemption). Law enforcement materials regarding such law enforcement methods may be exempt if circumvention is likely to result from disclosure. *Dirksen v. U.S. Dept. of Health & Human Svcs.,* 803 F.2d 1456, 1458 (9th Cir.1986).

In *Hardy,* the Ninth Circuit found that the Internal Rule and Practices Exemption applied to an ATF training manual, which trained agents on the conduct of raids and searches because "[m]aterials instructing law enforcement agents on how to investigate violations concern internal personnel practices." *Hardy,* 631 F.2d at 656–57. Similarly, in *Dirksen,* the court applied the exemption to Medicare claims-processing guidelines that, if disclosed, could be used by health care providers to avoid audits. *Dirksen,* 803 F.2d at 1458–59 ("It is not difficult to believe that, among the care providers in possession of these materials, there would be some who would try to fit their claims into the 'automatically granted' category. Nor is it difficult to believe that, upon the submission of a barrage of claims fashioned to conform to the Guidelines, the Guidelines would lose the utility

they were intended to provide."). In *Dirksen,* the court also cited:

> [N]ormal policy considerations also require that [operational directives] remain confidential.... To turn such manuals over to those who are the subject of regulatory supervision is to dig a den for the fox inside the chicken coop.

*Id.* at 1459 (quoting *Ginsburg, Feldman & Bress v. Federal Energy Admin.,* 591 F.2d 717, 730 (D.C.Cir.1978)).

Here, as the foregoing discussion of the Law Enforcement Purpose Exemption demonstrates, the SIRs database was, and is, maintained for a law enforcement purpose: namely, to synthesize battlefield intelligence and make it available to military and PSC personnel in order to protect the lives of those individuals.

Plaintiff's arguments that the materials are "widely disseminated" and, as such, are not "predominantly internal" is not persuasive. First, the Court notes that the information Plaintiff seeks with this lawsuit-the names of the PSC companies-is not entered into the SIR database that Plaintiff sought with its FOIA request. Second, Defendants have demonstrated that the SIRs are compiled for predominantly internal purposes: to provide intelligence information to the military. The fact that the SIRs information is also made available to some PSCs does not negate this fact. Third, the Dillon Declaration establishes that:

> Access to the website [containing the SIRs database] is controlled by an application process and is limited to those members/employees of the PSCAI [Private Security Company of Iraq] and Army officials that have a need to know the information for the performance of their security-related duties. The SIRs are distributed to the personnel that are directly responsible for planning and conducting operations including secure

movements of Army, government, and private personnel in and about hostile areas in Iraq.

(Dillon Decl. ¶ 17.)

Defendants have provided non-conclusory declarations sufficient to establish that disclosure of the PSC company names could reasonably risk circumvention of the law. (*Id.* ("Releasing contractor names would enable insurgent forces to conduct unlawful activities and avoid detection by identifying specific responses and locations with specific contractors and focusing on those believed to be more vulnerable.").) It does not require a great leap in logic to accept Colonel Dillon's judgment that insurgents could use the PSC company names, in conjunction with the information already made available in the partially-redacted SIRs, to disrupt U.S. reconstruction efforts and circumvent the rules.

Therefore, Defendants have established that the Internal Rules and Practices Exemption applies because the information has a law enforcement purpose and that disclosure of the information would risk circumvention of the law and the military's efforts to establish stability for reconstruction efforts Iraq. Defendants' Motion for Summary Judgment is GRANTED on the issue of the withholding of the PSC company names pursuant to the Internal Rules and Practices Exemption at 5 U.S.C. § 552(b)(2).

### C. The Public Interest

The Court recognizes that Plaintiff's FOIA request has identified a keen public interest in the government's operations in Iraq. It is undeniable that the public has a right to demand information about the role of PSCs in Iraq. However, the Court has

reviewed the representative sampling Plaintiff provided of the partially-redacted SIRs provided by Defendants, and the Court is confident that the public interest is, to a large extent, addressed by the information included in those reports.

The public interest must be balanced against the life and safety interests of the military personnel, PSC employees, and other individuals on the ground in Iraq today. The Court's ruling here strikes the balance Congress sought to preserve "between the public's right to know and the government's legitimate interest in keeping certain information confidential." *Cntr. for Nat'l Sec. Studies*, 331 F.3d at 925 (citing *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151, 110 S.Ct. 471, 475, 107 L.Ed.2d 462 (1989)).

Construing the underlying facts and possible inferences therefrom in Plaintiff's favor, Defendants prevail here because they have met their burden, and the balancing of the public interest in the names of the PCS companies is outweighed by the need to protect the life and safety of those individuals exposed to the hazards of the complex battlefield on which they operate in Iraq.

### V. CONCLUSION

Therefore, Plaintiff's Motion for Summary Judgment (docket no. 14) is DENIED. Defendants' Motion for Summary Judgment (docket no. 12) is GRANTED.[25]

Defendants are ordered to submit a proposed judgment, consistent with this Order, to the Court within 20 days of the date of this Order.

---

**25.** As noted above, in FN 1, Defendants' Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction was premised on Plaintiff's pursuit of a claim that Plaintiff did not, in fact, pursue. Therefore, the Court DENIES AS MOOT Defendants' Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction (docket no. 12).